**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**at ASHLAND**

**CIVIL ACTION NO. 06-104-DLB**
**(BANKRUPTCY CASE NO. 02-14261)**

**IN RE:**

**HNRC DISSOLUTION COMPANY f/k/a**                                    **DEBTORS**
**HORIZON NATURAL RESOURCES**
**COMPANY, ET AL.**
_____

**ZURICH AMERICAN**
**INSURANCE COMPANY**                                                 **APPELLANT**

**vs.**                        **MEMORANDUM OPINION & ORDER**

**LEXINGTON COAL**
**COMPANY, LLC**                                                      **APPELLEE**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**I.    INTRODUCTION**

Pursuant to 28 U.S.C. § 158(a)(1), Appellant, Zurich American Insurance Company

("Zurich"), brings this appeal against Appellee, Lexington Coal Company ("LCC").

Appellant seeks relief from a final order of the United States Bankruptcy Court for the

Eastern District of Kentucky, Ashland Division, denying Zurich's application for allowance

of an administrative expense claim.[1]    The primary issue on appeal asks whether

_____

[1] The underlying bankruptcy action is Case No. 02-14261 and is styled *In re HNRC Dissolution Co., f/k/a Horizon Natural Resources Co., et al.*, 343 B.R. 839 (Bankr. E.D. Ky. 2006). The orders in question, from which this appeal is taken, are the Memorandum Opinion (Bankr. Doc. # 7404) ("Opinion") and related Order (Bankr. Doc. # 7406) ("Order").

prospective post-confirmation deductible payments on insurance policies entered into by the former Debtors' estate with Zurich during the pendency of the bankruptcy are entitled to administrative expense priority under 11 U.S.C. § 503.[2]

This matter is presently before the Court by way of Appellant's Notice of Appeal from Bankruptcy Court (Doc. # 1) and Appellant's Opening Brief (Docs. # 12, 14) seeking reversal of the Bankruptcy Court's denial of Zurich's administrative expense claim or, in the alternative, remand to the Bankruptcy Court for further hearings to allow Zurich to present evidence in support of its claim.  LCC subsequently filed a Brief for the Appellee (Doc. # 24) and Zurich responded with its Reply Brief (Doc. # 26).  Oral argument was held on June 15, 2007 with Karen Turner present for Zurich and Gregory Schaaf present for LCC. Therefore, this appeal is now ripe for adjudication by the Court.

## II.   BACKGROUND DISCUSSION

### A.   Summary

During the period from June 29, 1998, to September 30, 2004, Zurich and its affiliated companies provided workers' compensation, general liability and business automobile insurance coverage (the "Zurich Policies") to certain of the above-captioned debtors (collectively, the "Debtors") on various policies containing "deductibles."  On a deductible policy, the insured agrees to retain some of the risk of claims and the insurance company reduces the premium accordingly.  Under Zurich's Insurance Program, the insured was not obligated to pay the deductible in full upon the occurrence of the claim, but

---

[2] This matter is properly before this Court pursuant to Appellant's election under 28 U.S.C. § 158(c)(1)(A), which permits an appellant to have a case heard by a district court in lieu of the Bankruptcy Appellate Panel.

rather Zurich would advance money to pay losses and expenses and the insured would not pay until billed.  These advances were interest free.

Zurich's administrative expense claim is a claim for the amount of the Ultimate Loss Projection (as defined herein) minus collateral or loss fund held and minus past payments made by the Debtors for deductibles.  The present projected amount of the administrative claim is $14,593,567.79, an amount that would have been less but for the insolvency of Frontier Insurance Company, the insurance company that provided certain collateral bonds to secure the Debtors' obligations as principal obligor.  As confirmed during oral argument, these bonds now appear to have de minimis value.

**B.     Procedural History**

On November 13 and 14, 2002 (the "petition" dates), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Kentucky, Ashland Division (the "Bankruptcy Court").  Following the failure of the Debtors' efforts to reorganize on a stand-alone basis, the decision was made to pursue the sale of substantially all of Debtors' assets.

On August 17, 2004, the Debtors conducted an auction of substantially all of their remaining assets in accordance with bidding procedures previously approved by the Bankruptcy Court.  On September 16, 2004, the Bankruptcy Court entered two orders confirming the Debtors' Plans (collectively, the "confirmation Orders"), which granted authority to LCC to object to, as well as the authority to resolve and settle, all administrative expense claims in the first instance as a primary asset purchaser.  The Debtors subsequently closed the sale of their assets to the approved purchasers, and the Debtors'

plans, as modified by the Confirmation Orders, became effective on September 30, 2004 (the date of "confirmation" or "liquidation").  Zurich, although aware of the confirmation hearings and the bankruptcy generally, did not participate in the proceedings.

According to the confirmed plans, a bar date of December 29, 2004 was established for the filing of administrative expense claims (but not ordinary course administrative expense claims).  On December 29, 2004, Zurich filed its Administrative Expense Request Form, identified as claim no. 20675 on the Debtors' claims register (the "Administrative Expense Claim").[3]  Through its Administrative Expense Claim, Zurich seeks payment from the Debtors, now LCC, for deductible obligations as an administrative expense based on Zurich's ultimate loss projection from claims based upon the relevant insurance policies during the pendency of the bankruptcy.

On February 18, 2005, LCC filed its Objection to Claim of Zurich American Insurance Company (Bankr. Doc. # 5492) (the "Initial Objection").  On July 29, 2005, LCC filed its Supplemental Objection to Claim of Zurich American Insurance Company (Bankr. Doc. # 6646) (the "Supplemental Objection," and, together with the Initial Objection, the "Objection").  On August 31, 2005, Zurich filed its Response to Supplemental Objection of LCC to Claim of Zurich American Insurance Company (Bankr. Doc. # 6853) (the "Response").  On September 15, 2005, LCC filed its Reply to Response to Supplemental Objection of LCC to Claim of Zurich American Insurance Company (Bankr. Doc. # 6918) (the "Reply").

---

[3] The Administrative Expense Claim is made up of: (a) the Administrative Expense Request Form, (b) an Addendum to Administrative Expense Request Form, (c) Exhibit A, titled "The Insurance Contracts", and (d) Exhibit B, titled "Collateral Charge Summary."

Thereafter, on November 21, 2005, the Bankruptcy Court entered an order requiring the parties to tender joint stipulations and a list of exhibits (Bankr. Doc. # 7071).   On January 24, 2006, Zurich and LCC filed the Agreed Stipulated Facts and List of Exhibits of Zurich American Insurance Company and Lexington Coal Company, LLC (Bankr. Doc. # 7180) (the "Stipulated Facts").   Subsequently, on May 30, 2006, the Bankruptcy Court entered its Memorandum Opinion and Order ("Bankruptcy Opinion") denying Zurich's Administrative Expense Claim  (Bankr. Doc. # 7406).  On June 9, 2006, Zurich timely filed its Notice of Appeal (Bankr. Doc. # 7432).

## C.    Insurance Policies

Prior to and after the petition dates, Zurich provided insurance coverage to the Debtors.  Zurich and two of its affiliated companies, American Zurich Insurance Company ("American Zurich") and Steadfast Insurance Company ("Steadfast"), issued various insurance policies to the Debtors covering both the pre-petition and post-petition periods, including but not limited to workers' compensation insurance, business automobile insurance, and general liability insurance.

The Zurich Policies were deductible policies.  On a deductible policy, the insured agrees to retain some of the risk of claims within the deductible layer.  In other words, similar to automobile or other personal insurance plans, the insured agrees to pay a certain amount for an expense on a claim where the insurer is then responsible for any amount of expense that exceeds the deductible ceiling.  In this instance, Zurich would advance the money to pay the losses and expenses and the Debtors would then reimburse Zurich when

billed for the deductible costs under the policy.[4]  For some of the earlier Zurich Policies, the Debtors made payments within the deductible layer to a third-party administrator.  Under the deductible agreement between the Debtors and Zurich, default occurs when the insured "fail[s] to pay any amount when it is due under this Agreement . . . ."

Many companies purchase insurance policies that contain deductibles agreements so that they pay a smaller premium in exchange for agreeing to bear the risk of claims within the deductible layer, similar to personal automobile insurance.  These policies are generally less expensive than policies with no deductibles – commonly referred to as "guaranteed cost" policies – even after considering the insured's exposure to deductibles.  Here, because the Debtors purchased deductible policies, their agreed-upon premiums were reduced as a result of absorbing some of the risk to the insurer, Zurich, by way of paying costs within the deductible layer when claims arise.  These deductible costs, as discussed above, would initially be paid in full by Zurich to the relevant care provider (or other payee), and Zurich would subsequently bill the Debtors for the deductible costs that were advanced under the terms of the policies.

In the insurance industry, claims are either considered "open" or "closed."  Claims that are currently active are termed "open."  However, an inactive or closed claim may be reopened sometime in the future due to circumstances surrounding the nature of the claim.  In other words, although a claim may occur during a policy coverage period and may even

---

[4] Advancing deductible costs is less common where the insured is an individual, rather than a business.  Where the deductible costs are not advanced, the care provider (in a health insurance context) seeks out the deductible payment or "co-pay" from the individual that is insured, instead of the insurance company paying the entire amount due to the care provider and then billing the insured for the deductible costs (i.e., advancing deductibles).

be closed before the expiration of the coverage period, the claim may be reopened and costs may be incurred in connection with the prior coverage at some juncture after the coverage has expired; payments on some types of claims may extend over many years. Because costs often arise after the end of a coverage period that the insurer must still pay if the costs stem from a claim filed within the coverage period, there is also an ongoing deductible obligation of the insured beyond the mere termination of the coverage period. This is the scenario under which the current action arises.

For example, a worker may suffer a compensable injury on December 1, 2002, but receive compensation payments and medical reimbursements over many years. Perhaps the condition abates but flares up in future years. Or the injury might be latent and manifest itself years later. In the case of workers' compensation insurance, a claim might remain open for years or may be open, closed, and then reopened. In the insurance industry, therefore, insurance companies need to understand and calculate the total expected exposure, referred to herein as the ultimate loss projection (the "Ultimate Loss Projection").

When an insured's ongoing deductible obligation is not limited pursuant to a deductible agreement, as in the current context, an insured will need to know (i.e., estimate) these prospective deductible obligations of the insured in order to project its future cash requirements and issue accurate financial statements. Insurance companies also need to know this amount to prepare for future payments and negotiate with the insured as to how these amounts will be paid or secured, such as through the posting of collateral or loss funds, assuming alternatives are even allowed by the applicable deductible agreement or negotiated in a renewal policy.

-7-

Both parties to major insurance contracts typically utilize the expertise of actuaries to calculate the ultimate loss projection within industry standards. The actual deductible obligations of an insured may be less than or greater than the insurance company's Ultimate Loss Projection. Considering only the amounts that have been paid on claims as of a specific date may not present a complete picture of the total liability for deductibles over time, depending on the language of the deductible agreement.

There can be no question that here, as in many contexts, the insurance coverage provided by the Zurich Policies was critical to the Debtors' operations. Without the insurance provided by Zurich, the Debtors would have been unable to operate their business as a going concern both prior to and during the pendency of the bankruptcy.[5] Specifically, the workers' compensation insurance and business automobile insurance were vital to the Debtors' business. Even so, Zurich continued coverage of the Debtors during bankruptcy with full knowledge that the deductible obligations of the soon-to-be dissolved estate may not survive the liquidation. Although Zurich attempted to negotiate varying forms of protection for the prospective deductibles that would inevitably arise in the future and likely post-confirmation, it now appears that some of this protection – namely bond collateral – will not sufficiently cover the entire ultimate loss projection, which constitutes mere educated speculation at this stage.

---

[5] State law actually required the Debtors to carry workers' compensation coverage, so the insurance policies themselves necessarily constituted a significant benefit to the estate in that the coverage allowed the Debtors' business to operate.

**D.     Policy Renewal**

In September 2002, which was mid-policy for the year ending June 2003, Zurich raised the issue of collateral with the Debtors to offset its potential risk from advancing deductible costs under the terms of the policy.   At that time, the Debtors' consultant prepared an estimate.   The Debtors began negotiating a renewal policy with Zurich in January 2003, two months after Debtors' filed for bankruptcy reorganization.   At the same time, the Debtors also pursued discussions with AIG and Old Republic to obtain competing bids from different insurance carriers.   Zurich's premium request was nearly half of the amount Old Republic sought for similar coverage terms.   AIG did not provide Debtors with a quote.

In May 2003, in preparation for a June 2003 policy renewal, Zurich again discussed with the Debtors the need for additional collateral to offset the risk to Zurich, primarily surrounding the Debtors' prospective deductible obligations under the policy.   In these discussions, Zurich explained the "loss pick"[6] with the insured and discussed the appropriate level of collateral.   Zurich initially sought $15,000,000 in collateral, but by the end of the negotiations, Zurich and the Debtors agreed to collateral in the amount of $10,000,000, which Zurich agreed to receive following the effective date of what was then going to be a stand-alone plan of bankruptcy reorganization.[7]   The date of the payment was

---

[6] The "loss pick" is the estimation of the ultimate loss made at the beginning of the policy period.

[7] The reduction in the negotiated collateral amount also included the replacement of certain bonds that would presumably be of greater risk than the collateral with which they were replaced. These replacement Frontier bonds, which Zurich now values at zero, were undated and the true value unknown.

subsequently changed when the bankruptcy plan shifted from mere reorganization to liquidation of assets and, ultimately, liquidation of the Debtors' estate.

Between collateral – $31 million for workers' compensation and black lung only – and premium costs, the Debtors estimated that the insurance program would cost approximately $50 million to fund for the relevant coverage period.  While Zurich and the Debtors continued to negotiate collateral, a short-term extension beginning June 2003 was negotiated with only a 22% premium increase, which represented a discounted rate under market conditions and relative to the finalized terms of the policy reached by the Debtors with Zurich.  At the end of the final negotiations, Zurich and the Debtors agreed to collateral of $10 million and, by way of the June 2004 Amended Order (discussed *infra*), the date for payment of the $10 million was altered due to the shift from reorganization to liquidation.

## E.    Assumption of Policies

During the course of their chapter 11 proceedings, the Debtors assumed the Zurich Policies.  On September 5, 2003, the Debtors filed with the Bankruptcy Court the Motion of Debtors for Orders Authorizing Assumption of Certain Insurance Contracts (Bankr. Doc. # 1785) (the "Motion to Assume").  Pursuant to the Motion to Assume, the Debtors sought to assume the Zurich Policies and Program[8] pursuant to section 365 of the Bankruptcy Code.  In the introductory paragraph of the Motion to Assume, the Debtors stated that they sought an order from the Bankruptcy Court authorizing the "assumption by the Debtors of

---

[8] "Program" was defined in the Motion to Assume at Section 6 as follows: "Since 1998, Zurich (including its affiliated companies) has provided worker compensation, business automobile, general liability and other coverages as part of an insurance program for Horizon and its predecessors and affiliates and all related deductible agreements and specifications thereto (the "Program")."

certain insurance contracts between the Debtors and Zurich American Insurance Company and its affiliates ('Zurich') and other insurers (the 'Contracts')."

On September 23, 2003, the Bankruptcy Court entered the Order Granting the Motion of Debtors for an Order Authorizing Assumption of Certain Insurance Contracts (the "Assumption Order").  According to Appellant, Zurich repeatedly communicated to the Debtors that any assumption would be conditioned upon the Debtors assuming all liabilities for all policies.[9]  Attached to the Motion to Assume were various revised binders for the renewals, each of which contains the condition that "The Debtors assume all the Zurich policies for all years ("the Policies") and all liabilities under Section 365."  The binders also state that "Zurich receives administrative expense treatment for all monies due under the Policies."

All of the insurance coverage extended by Zurich to the Debtors under the Assumption Order was subject to renewal on June 29, 2004.  Zurich chose not to renew the insurance policies, which was valid under the terms of the insurance policies. Subsequent to the non-renewal, however, Zurich and the Debtors negotiated terms for extending the coverage period.  These negotiations between the Debtors and Zurich resulted in the June 25, 2004 Stipulation and Amended Order Authorizing Assumption of Insurance Contracts with Zurich American Insurance Company (Bankr. Doc. # 3381) (the "June 25, 2004 Amended Order").

---

[9] Additionally, Paragraph 8 of the Debtors' Motion to Assume states: "Zurich informed the Debtors that assumption under section 365 of the Bankruptcy Code of the entire package – all programs, all policies, and all liabilities – would be a condition of any renewal, and that Zurich's expectation was that the Debtors would continue to meet all their obligations as they came due."

Section J of the June 25, 2004 Amended Order provides that "the Debtors believe that they will be able to meet all of their ongoing and future obligations under the insurance contracts, as and when they become due . . . ."  Additionally, footnote 3 of the June 25, 2004 Amended Order states:

> The projected total liability by the Debtors that will be due and owing to Zurich over the lifetime of the payments under the Insurance Contracts is in excess of $10,000,000, and Zurich retains the rights to assert an administrative claim for the balance of any claims under the Insurance Contracts. The Debtors reserve the right to object to any additional administrative claim asserted by Zurich.

The June 25, 2004 Amended Order required the Debtors to pay premiums of almost $900,000 per month; provide additional cash collateral or letters of credit of $1,255,000 per month; and provide $10 million in additional cash collateral at the effective date.[10]

Although the annual Zurich Policies would have expired on June 28, 2004, the June 25, 2004 Amended Order allowed for the policies to be extended on a month-to-month basis.  There were three 30-day extensions thereafter and Zurich subsequently granted two one-day extensions for a pro rated premium, which Zurich booked on its records as one two-day extension.  The final monthly extension expired on September 28, 2004 at 12:00 midnight, two days before the final bankruptcy plan was confirmed, and the Debtors' estate dissolved.

---

[10] Further, section 8 of the June 25, 2004 Amended Order provides: "The Debtors acknowledge that Zurich is drawing on certain surety bonds and letters of credit provided by certain third parties, which funds are being placed in the loss funds under the deductible agreements and specifications between the Debtors and Zurich."

**F.    Liquidation of the Estate**

On July 11, 2004, the Debtors filed their liquidating plans (the "Plans"), which contemplated the sale of substantially all of the Debtors' remaining assets to the successful buyer or buyers at an auction to be conducted by the Debtors in accordance with bidding procedures previously approved by the Bankruptcy Court.  On August 17, 2004, the Debtors conducted their auction of their remaining assets and the successful bidders were Newcoal, LLC, now known as International Coal Group ("ICG"), Oldcoal (now known as Lexington Coal Company), and A.T. Massey Coal Company.

On August 31, 2004, the Bankruptcy Court held a hearing on the proposed sale of assets and confirmation of the Plans and indicated its intention to approve the sale and confirm the Plans, as modified by the Debtors and by the Bankruptcy Court's ruling.  At the confirmation hearing, the Debtors were required to prove they could pay allowed administrative expense priority claims.  The Debtors' financial consultant testified at the hearing that there would be a cushion in excess of $20 million for administrative expense claims.  Zurich did not enter an appearance at the hearing regarding its forthcoming administrative expense claim that would surpass the entire amount of funds allocated by the Plans for satisfying the priority claims.[11]

As indicated in the notices of effective date of the Plans (Bankr. Docs. # 4220 and 4221), on September 30, 2004, the Debtors closed the sale of their assets to the approved purchasers and the Plans became effective.  As of the closing, the Debtors were deemed

---

[11] At present, however, the parties have informed the Court that there are sufficient funds in the administrative expense pool to cover Zurich's claim amount as it currently stands (~$14.5 million).  However, LCC asserts that this money was set aside to cover other anticipated regulatory liabilities that may reduce, or possibly eliminate, the pool.

dissolved in accordance with the Confirmation Orders.  The Zurich Policies were not assumed by asset purchasers ICG, LCC, or Massey as part of the Sale.  Zurich never entered an appearance in the Bankruptcy Cases until the filing of its administrative claim now in controversy, which was filed post-confirmation but prior to the bar date for priority claims as established by the Plans.

## G.    Zurich's Administrative Expense Claim

The Plans define an "Administrative Expense Claim" as consistent with governing law, stating as follows:

> Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under section 503(b), 507(a)(1), 507(b) and 1114(e)(2) of the Bankruptcy Code, and applicable case law including, without limitation, any actual necessary costs or expenses of preserving the Estate, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates of the Debtors under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

The bar date for filing administrative expense claims under the Plans was December 29, 2004.  The bar dates contained in the Plans do not, by their terms, apply to "Ordinary Course" expenses.

In accordance with the applicable bar date, Zurich filed an Administrative Expense Request Form and attachments on or about December 29, 2004, identified as claim no. 20675 on the Claims Register ("Zurich's claim").  The claim was in the amount of $44,744,067.  According to Zurich, its claim was filed as a protective measure to ensure payment of administrative expenses incurred by Zurich in the event that the surety bonds and other collateral provided by the Debtors to Zurich to secure the Debtors' payment of

insurance deductibles are ultimately dishonored or otherwise fail to cover the prospective deductible obligations.

## H.      Zurich's Loss Projections

As detailed herein, an ultimate loss projection is essentially a report prepared by actuaries with the basic purpose of estimating future obligations in connection with insurance coverage.  In connection with its filing for an administrative expense priority for future deductible obligations of the Debtors, Zurich has projected that the ultimate deductible loss (i.e., obligation) under the Zurich Policies will be $46,858,757, which does not include any legal costs and expenses that are generally reimbursable by the Debtors under the Zurich general liability policies.  Although Zurich expects to incur additional defense costs on the general liability policies, Zurich has not requested reimbursement of current or future defense costs related to the general liability policies.

Ultimate loss projections are actuarial analyses of the projected ultimate cost made on a regular periodic basis, which employ information provided by the insured and updated loss information.  These projections are used in the insurance industry to forecast total deductible liability on policies where the insured has agreed to be responsible for such liabilities and where such liability will inevitably extend into the future.  This is especially true for insurance policies providing workers' compensation coverage, which can extend years past policy expiration.  Consequently, and as reflected in the Ultimate Loss Projection, the workers' compensation claims are by far the largest of the total claims arising under the Program.

Because ultimate loss projections require actuarial judgment, two actuaries using the same data may arrive at different conclusions as to a reasonable expected value of the

ultimate losses, although the conclusions should be inside a range of reasonable estimates of the ultimate losses.  Notwithstanding any uncertainty that is inevitably present when predicting future obligations, insurance companies, such as Zurich, regularly create, maintain, and rely upon these actuarial reports in their ordinary course of business.

In terms of the methodology for calculating the ultimate loss projection for each separate policy, Zurich's projection takes into account numerous variables.[12]  According to Zurich, the methodology and data used in calculating the Ultimate Loss projection is based on widely accepted and employed industry standard actuarial methods of establishing deductible claims.  Based on a review of the relevant factors, Zurich then selects an appropriate loss number depending upon the circumstances of the policy and policy period as they relate to those factors.

Pursuant to the obligations of the Debtors in the June 25, 2004 Amended Order, Zurich holds cash collateral received from the Debtors in the amount of $1,255,000.  In addition to the cash collateral, Zurich received a letter of credit equal to $2,510,000.  The letter of credit, along with others totaling $7,900,000, were liquidated and placed in loss funds in connection with the Debtors' prospective deductible obligations.  Zurich also

---

[12] In constructing the projections, Zurich identifies, among other things, the policy period, the maximum amount of deductible liability, exposure amount as determined by information provided by the insured and updated as per audits, claims made for the policy period ("Deductibles Incurred"), claims paid, deductibles paid on behalf of the insured ("Deductibles Paid"), the estimated ratio of the ultimate value of known and unknown claims over current/reported losses ("Incurred LDF"), the estimated ratio of the ultimate value of claims known and unknown over current paid losses ("Paid LDF"), estimates of ultimate losses as the product of Deductible Incurred Losses and the Incurred Loss Development Factors ("Developed Incurred"), Developed Paid (product of Paid LDF and Deductible Paid), the Loss Pick, the weighted average between the Developed Incurred and the Loss Pick, and the weighted average between Developed Paid and the Loss Pick.

received the payment of $10,000,000 required by the June 25, 2004 Amended Order close to the Effective Date.

Zurich has asserted that the deductible payments previously received by Zurich and third-party administrators from the Debtors total $9,526,055.24.  The initial $44,744,067 listed as Zurich's administrative expense on the Administrative Expense Claim did not subtract deductible payments previously received by Zurich and third-party administrators from the Debtors, which are required deductions to arrive at the amount of Zurich's asserted Administrative Expense Claim.  If the Zurich Administrative Expense Claim shown on the Zurich Claim Form was calculated by deducting the payments previously received by Zurich and third-party administrators, the Zurich Filed Claim Form would have requested an Administrative Expense Claim of $35,218,011.76 ($44,744,067.00 less the $9,526,055.24 in payments).[13]

The amount of Zurich's administrative expense claim as it now stands, approximately $14.5 million, was calculated by taking the Current Ultimate Loss Projection minus the collateral or loss fund and payments made by the Debtors for deductibles in the past.  Zurich projects that the current deficiency amount is $14,593,567.79, which would

---

[13] Zurich also holds the following bonds issued by Frontier Insurance Company as collateral against the Debtors' prospective deductible obligation under the Zurich Policies:

Bond No. 153883 (effective 4/30/00) $2,600,383
Bond No. 153261 (effective 6/29/98) $2,979,500
Bond No. 153262 (effective 6/29/99) $3,323,700
Bond No. 153882 (effective 4/30/00) $2,500,000
Bond No. 153800 (effective 6/29/99) $3,285,898

Frontier Insurance Company ("Frontier") contends that Bond No. 153261 and Bond No. 153800 were cancelled or expired and the remaining bonds have nominal value.  The ability to collect under the Frontier bonds is in dispute.  Frontier is in receivership in the State of New York.  Zurich made a claim on all of the bonds in July 2004.

have been substantially reduced if Frontier had paid the surety.  The vast majority of the Current Ultimate Loss Projection is for workers' compensation insurance coverage.  Some or all the Deductible Agreements in connection with the policies contain different deductible amounts or aggregates for black lung or other types of claims.  The Deductible Agreements control these amounts.

## I.    Bankruptcy Opinion

The Bankruptcy Opinion (Bankr. Doc. # 7404) and related Order (Bankr. Doc. # 7406), issued on May 30, 2006, denied Zurich's application for allowance of an administrative expense priority claim in connection with prospective deductibles on the Zurich Policies.  Ultimately, the Bankruptcy Court held that Zurich failed to provide "any authority for its proposition that a claimant is entitled to administrative expense priority for claims that arise after the confirmation of a plan and after the estate ceases to exist."

The Bankruptcy Court also took issue with the prospective nature of the deductible obligations in that they require some degree of subjective determination:

> At this point, Zurich has provided nothing more than "its own statistical analysis of the likelihood such claims will occur" for the purpose of estimating its claim, and the court finds such analysis no more supportive of its claim than the *Eli Witt* court did.  The court does not see how Zurich can ever provide anything more than a statistical analysis until the events that precipitate a claim for deductibles occur.  These events, by necessity, will occur post-confirmation.

Further, the Bankruptcy Court was not even convinced that estimation is proper under the Bankruptcy Code in this case because estimation for the purpose administrative expense claims typically occurs in the "post-petition, pre-confirmation period of estate administration."

Finally, the Bankruptcy Court took issue with Zurich's failure to participate in the bankruptcy process until after the confirmation of the Plans.  This failure, according to the Bankruptcy Court, "necessarily deprived" the creditors and other parties in interest "of the opportunity to factor in a huge administrative expense claim that would have had a major effect on the consideration of the feasibility of the Debtors' proposed Plans."  Accordingly, the Bankruptcy Court concluded that "Zurich should have participated in the Debtors' cases and requested an estimation of its administrative expense claim prior to the confirmation process" and, therefore, "Zurich's request for estimation is neither appropriate nor timely under these circumstances."

Following the Bankruptcy Court's denial of Zurich's claim, Zurich filed a Notice of Appeal on June 9, 2006 (Bankr. Doc. # 7432).  On June 16, 2006, Zurich filed its Statement of Issues and Designation of Items to be Included in the Record on Appeal  (Bankr. Doc. # 7447).  LCC subsequently filed its counterdesignation of items to be included in the record on June 26, 2006 (Bankr. Doc. # 7460).  The record from transferred from the Bankruptcy Court to the District Court, and the appeal was docketed, on July 11, 2006 (Bankr. Doc. # 7481).  The Notice of Appeal was entered with this Court on July 12, 2006 (Doc. # 1).

### III.   ANALYSIS

At the outset, the Court recognizes that the only question which must be determined is how the prospective deductible obligations are to be treated, not whether they are in fact "legal" obligations.  In other words, it is undisputed that Zurich will be rightfully "owed" any deductible obligations advanced under the Zurich Policies (pursuant to the Deductible Agreements) when they "arise," but it is not patently clear if the obligations constitute

expenses incurred in the administration of the bankruptcy estate or mere debt owed under contract to which Zurich could attempt to recover as a creditor of the dissolved estate. The very narrow issue, therefore, is whether the prospective deductible obligations claimed by Zurich should receive administrative expense treatment whereby Zurich would be given priority above that afforded to most creditors.

The practical consequences of the legal distinction between administrative expenses and liability incurred outside the administration of the bankruptcy can prove significant in many cases. Should priority status be granted to Zurich in this matter, the requested claim amount would "come off the top" before the proceeds of the estate liquidation would be distributed among the unsecured creditors of the now-defunct Debtors. Where, as here, a pool of funds has been previously set aside to satisfy administrative expense claims made against the estate, Zurich's requested claim amount would be withdrawn from the "priority pool" if priority status is granted.[14] Any funds that remain in the pool, including part or all of the funds Zurich now requests should priority status be denied, may revert back to asset-purchaser LCC or be utilized for other means (e.g., reclamation) under the terms of the Plans and Confirmation Orders.

---

[14] Although the nearly $20 million remaining in the "pool" is sufficient to cover Zurich's administrative expense claim, which currently stands at approximately $14.5 million, LCC maintains that the "excess" pool amount was set aside as part of an agreement with regulatory authorities for reclamation purposes. Consequently, according to LCC, because the large majority of the funds in the pool were not intended for traditional administrative expense claims (other priority claims were already satisfied), the pool would fail in large measure to cover both Zurich's claim and the "intended" reclamation costs.

**A.      Standard of Appellate Review**

On appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1), this Court

reviews the Bankruptcy Opinion *de novo* as to its conclusions of law.  *See In re Made in*

*Detroit*, 414 F.3d 576, 580 (6th Cir. 2005).  Any findings of fact are upheld unless they are

found to be clearly erroneous.  *See id.*  However, the Bankruptcy Opinion is largely founded

upon findings of fact based solely on voluntary stipulations by the parties as set out in the

Agreed Stipulated Facts and List of Exhibits (Bankr. Doc. # 7180) ("Stipulated Facts").  To

the extent the findings of fact within the Bankruptcy Opinion stem from the Stipulated Facts,

those facts are binding on this Court.  *See Varga v. Rockwell Int'l Corp.*, 242 F.3d 693, 699

(6th Cir. 2001).

**B.      Administrative Expense Priority Not Warranted**

**1.      "Actual" and "Necessary"**

The United States Bankruptcy Code (the "Code") defines administrative expense

priority claims as the "*actual, necessary* costs and expenses of *preserving* the estate."  11

U.S.C. § 503(b)(1)(A) (emphasis added).  The Code's definition of administrative expenses

provides the boundary for the aforementioned distinction between claims of general

creditors and administrative expense claims, whereby the latter receive priority over the

former.[15]  The rationale behind the priority provisions within the Code, at least in the

liquidation context, is to facilitate the continued operation (i.e., going concern) of debtors-in-

possession "by encouraging third parties to provide those businesses with necessary goods

---

[15] In actuality, administrative expense status provides that, pursuant to 11 U.S.C.
§ 507(a)(1), the administrative claim is treated as a first priority unsecured claim and is paid before
all other unsecured creditors.  *See United States v. Ginley (In re Johnson)*, 901 F.2d 513, 517 (6th
Cir. 1990).

and services" that enable the maximization of value for creditors of the estate upon liquidation. *In re United Trucking Serv.*, 851 F.2d 159, 161 (6th Cir. 1988).

Importantly, because of the overarching goal to "keep administrative expenses at a minimum and thus preserve the estate for the benefit of all creditors," it is well-established that "priority statutes are *strictly construed*." *In re Patch Graphics*, 58 B.R. 743, 745 (Bankr. W.D. Wis. 1986) (emphasis added); *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1377 (11th Cir. 1994) (Administrative expenses under § 503 "should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors."); *see also Otte v. United States*, 419 U.S. 43, 53 (1974); *In re Kmart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003); *In re The Eli Witt Co.*, 213 B.R. 396, 399 (Bankr. M.D. Fl. 1997); *In re D'Lites of America*, 108 B.R. 352, 355 (Bankr. N.D. Ga. 1989):

> [T]here must be a strict construction of the terms "actual" and "necessary" therefore requiring that the estate actually receives a real benefit from the transaction, before administrative priority will be granted on claims against the estate . . . .  The focal point of the allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss. . . .  Thus, a court looks to the actual benefit to the estate and not the loss sustained by a creditor.

*In re Globe Metallurgical, Inc.*, 312 B.R. 34, 40 (Bankr. S.D. N.Y. 2004) (internal citations omitted).

To that effect, the narrow application of § 503(b)(1)(A) is rather unambiguous on its face: the claimed expense must have been an "actual" cost that is "necessary" to the "preservation" of the estate.  *See In re Patch Graphics*, 58 B.R. at 745 (citing *In re Club Dev. & Mgmt. Corp.*, 27 B.R. 610, 612 (Bankr. App. 9th Cir. 1982)) ("An administrative expense may not be allowed absent a finding that the expense is necessary for preserving the estate.").  It is in this regard that Zurich's claim fails as a simple matter of statutory

-22-

interpretation on both fronts: the claimed expenses are not "actual" (i.e., not yet realized) and the payment thereof, when the obligations are realized, cannot act to preserve an estate that no longer exists.  At the moment Zurich's Claim was filed on the bar date for administrative expense claims, the ultimate loss projection for the deductible obligations was entirely speculative by nature and prospective by definition.

Nevertheless, despite LCC's subtle mention otherwise, there can be no question that Zurich will be forced to "advance" a substantial portion, if not all, of the deductible obligations in question.[16]  A key consideration, however, is the reality that Zurich is only contractually obligated to pay the deductibles, and subsequently seek reimbursement, once the claims actually "arise."  Zurich contends that "arise" in this context should be viewed from a more macro perspective, effectively arguing that, even though the legal obligation to pay the expenses will not accrue until sometime in the future, the underlying event giving rise to the future claim (e.g., an employee's initial injury) necessarily occurred during the bankruptcy administration.[17]  In other words, Zurich asserts that the accrual of the claims

---

[16] At oral argument, Zurich was adamant that, regardless of whether its claim for administrative expense priority was granted, it would be required to continue advancing deductibles pursuant to the Deductible Agreements at risk of losing its insurance license even though the contracts themselves are presumably void following the bankruptcy confirmation that acted to discharge the Debtors' liabilities generally and specific legal obligations under contract (notably, the Zurich Policies were not assumed by LCC).

[17] It is important to understand the practical realities of how these deductible obligations will inevitably arise, and in large number.  In oversimplified terms, an employee of the Debtors would have been covered by workers' compensation insurance through Zurich during the pendency of the bankruptcy via the debtor-in-possession's assumption of the Zurich policies.  Therefore, when an event occurs that is covered by the policy, such as the injury of an employee, that injury will inevitably give rise to medical bills and other expenses.  Even though the injury occurred during the coverage period, the effects of the injury will often times be felt for many years subsequent in the form of additional health care costs and the like.  Because the later expenses stem from the original injury during the coverage period, the expenses will still fall under the domain of Zurich.  And when dealing on such a large scale, these deductible expenses will reach well into the millions of dollars

should essentially relate back to the underlying insurance coverage as part and parcel of the relevant insurance policies, which include the premium obligations that were assigned administrative priority and satisfied accordingly.  But Zurich does not, and cannot, provide any direct authority to support the contention that expenses necessarily realized post-confirmation can legally be characterized as "actual" under the Code.

Furthermore, even assuming that the claimed expenses can arguably constitute actual costs because they will inevitably occur to some significant degree and unquestionably stem from insurance coverage during bankruptcy, any argument that the payment of the claimed expenses is necessary to preserve the estate is unpersuasive.  The bottom line remains that Zurich is not contractually obligated to pay any of the deductible obligations in question until claims are filed, which will necessarily occur post-confirmation. The moment Zurich is contractually permitted to seek reimbursement from the Debtors for the advanced deductibles, the estate will have already dissolved and the Debtors will cease to exist.  Consequently, payment of the claimed expenses will in no way act to preserve an estate when there is no estate to preserve.

Administrative expense priority is granted only for the limited purpose of administrating, and thereby preserving, the bankruptcy estate.  *See Reading Co. v. Brown*, 391 U.S. 471, 475 (1968) ("[T]he words 'preserving the estate' include the larger objective, common to arrangements, of operating the debtor's business with a view to rehabilitating it."  The Supreme Court acknowledged that, in the liquidation context, the parallel purpose is to preserve the estate as a going concern.).  "Because there is no need to preserve an

---

range; according to Zurich, the total deductible outlay will likely near $50 million.

estate that has been terminated, costs that are incurred after that time are not administrative expenses of the estate." *Guy v. Terex Corp.*, No. 91-3687, 1992 U.S. App. LEXIS 10018, at *12 (6th Cir. 1992). Accordingly, Zurich's administrative expense claim fails to satisfy the requirements of § 503(b)(1)(A) because the claimed expenses were neither actual at the time of filing nor will they be necessary to preserve the bankruptcy estate when the expenses are ultimately realized.

### 2.    "Benefit to the Estate" Test

In the Sixth Circuit, as well most sister circuits, a two-part test has arisen to aid in the determination of whether expenses that are the subject of an administrative claim should receive priority treatment pursuant to § 503 of the Code. The aptly named "benefit to the estate" test asks whether the claimed expenses: (1) arose from a transaction with the bankruptcy estate, and (2) directly and substantially benefitted the estate. *See In re Sunarhauserman, Inc.*, 126 F.3d 811, 816 (6th Cir. 1997) (citing *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106, 110 (6th Cir. 1987). The burden of proof rests with the moving party, Zurich, to demonstrate by a preponderance of the evidence that the claimed expenses are entitled to administrative priority. *See In re Kmart Corp.*, 290 B.R. at 621; *see also In re Patch Graphics*, 58 B.R. at 745 (citing *Woods v. City Nat. Bank & Trust Co.*, 312 U.S. 262, 268 (1941)) ("The burden of proof is on the party seeking an administrative claim.").

Although the benefit to the estate test "limits administrative claims to those where the consideration for the claim was received during the post-petition period," the test is facially silent – as is the case law (*see infra*) – as to prospective expenses arising post-confirmation that stem from a contractual arrangement entered into by the debtor-in-

possession during bankruptcy. *Id.* It is in this respect that the refined benefit to the estate

approach, which was developed largely in response to the common problem of

characterizing damages from legal judgments,[18] is of little assistance as applied to Zurich's

claim in lieu of the traditional and statutory requirements of § 503(b)(1)(A).[19] Nevertheless,

despite the difficulty in applying the test to the case *sub judice*, Zurich's claim again fails

to warrant administrative priority under the benefit to the estate approach.

Even assuming *arguendo* that the expenses arose (or *will arise* in Zurich's case)

from a transaction with the bankruptcy estate, accelerated reimbursement via

---

[18]The Sixth Circuit, in *In re Eagle-Picher Industries, Inc.*, explained the development of the benefit to the estate test as a response to the Supreme Court's ruling in *Reading*, which permitted administrative expense priority for a post-petition tort claim:

> [T]he Bankruptcy Code defines administrative expenses incurred during the pendency of the bankruptcy and payable by the debtor as the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1). In *Reading Co. v. Brown*, 391 U.S. 471 (1968), the Supreme Court held that a postpetition tort claim against a debtor constituted an "actual and necessary cost" of the administration of the estate under § 503. Since then, and in reliance on *Reading*, this circuit (like many others) has used a two-part test to determine whether a claim is an administrative expense under § 503: "[A] debt qualifies as an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *In re Sunarhauserman, Inc.*, 126 F.3d 811, 816 (6th Cir. 1997).
>
> Applying Reading and this two-part test, courts have concluded that the following claims fall within the Code's definition of administrative expenses: tort, trademark infringement, patent infringement, and breach of contract. Under these precedents, [Appellee's] claims satisfy the traditional definition of "administrative expenses" so long as they arose from transactions that occurred between it and [debtor] after the petition for bankruptcy – which indeed they did.

447 F.3d 461, 464 (6th Cir. 2006) ("*Eagle-Picher*") (some internal citations omitted).

[19] The benefit to the estate test is now frequently applied to cases involving pre-petition/post-petition controversies – e.g., *In re Sunarhauserman* – but the traditional problem of how to treat law suit judgments spanning either the beginning or end of a bankruptcy are still common. *See, e.g.*, *Eagle-Picher,* 447 F.3d at 461 (administrative expense claim confined to post-petition damages stemming from a patent-infringement action).

administrative priority status will not act to provide a direct and substantial benefit to the estate where the claimed expenses will not become legal obligations until unknown points in the future, if ever.  At first glance, the inquiry into whether claimed expenses provided a direct and substantial benefit to the estate engenders a temporal dilemma similar to, yet less workable in this context, than that posed by the "preservation of the estate" requirement under § 503.  The timing problem arises because the question one must ask is whether the benefit should be measured at the moment the expenses become "actual" or whether it is appropriate to actuarially accelerate the reimbursement of the expenses because they stem from a contractual obligation entered into by the debtor-in-possession.

Predictably, as in the statutory debate under the language of § 503, Zurich argues under the benefit to the estate test that the claimed expenses satisfy the requirements for administrative priority because the prospective deductible obligations, as part and parcel of the underlying insurance policy, provided a vital service to the Debtors by enabling continued operation of the estate during bankruptcy. LCC acknowledges the incontrovertible benefit that the insurance coverage itself provided to the Debtors' estate, but contests the characterization of the speculative expenses as beneficial to the estate because the claims won't arise until post-confirmation when the estate has dissolved.

As in the analysis under the traditional statutory framework of § 503, the benefit inquiry as applied to Zurich's claim essentially asks whether expenses that arise and are incurred post-confirmation should relate back to the underlying contractual arrangement during the bankruptcy where such arrangement did not cognize the acceleration of the speculative expenses.  The resolution of this controversy comes from the adjudicatory constraint placed on the Court, as established *supra*, to strictly construe the requirements

-27-

and the ultimate allowance of priority claims under the Code.  *See In re Kmart Corp.*, 290 B.R. at 621 ("[T]he claimant must demonstrate that the benefit is more than a speculative or potential benefit.").

Applying a purpose-driven and narrow construction of both the statutory and common law approach for administrative claims, as is mandated by the general priority scheme of the Code, there is only one conclusion that can be reached under the unique circumstances in this case: the payment of the deductibles, when and if they should arise (i.e., become "actual"), does not provide a direct and substantial benefit to, nor act to preserve, a bankruptcy estate where there is no longer an estate to benefit.  In the end, beyond the reality that the deductibles will not come due until after the estate dissolved (which is also common in the post-confirmation judgment cases), it is the special case here that the deductible obligations do not even exist until claims arise whereby Zurich must advance payment.

As such, this is not a situation where Zurich's claim encompasses only pre-confirmation expenses from post-petition events that will be paid post-confirmation; rather, Zurich's claim requests expenses that will necessarily be paid post-confirmation because the "claims" giving rise to the expenses will necessarily occur post-confirmation. Accordingly, just as Zurich's claim is not for actual expenses necessary to the preservation of the estate, the claimed expenses similarly fail to provide a direct and substantial benefit to the estate.  *See In re Oread, Inc.*, 269 B.R. 871, (Bankr. D. Kan. 2001) (interpreting *In re Eli Witt*, 213 B.R. at 400) ("Even for injuries suffered in postpetition accidents, if the claim had not been presented by the time of plan confirmation, it could not be characterized as an actual claim, necessary to the preservation of the estate.").

-28-

3.      **Case of First Impression**

As the parties readily acknowledged during oral argument, there is an unfortunate lack of precedent capable of shedding light upon the rare issue at hand.  Both parties attach a significance to this realization.    According to Zurich, the reason for the novelty is simply because in the past, and across the entire spectrum of insurers providing coverage to debtors-in-possession during bankruptcy, the insurance companies have always recouped their deductible expenses.  Regardless of whether this has historically been accomplished through private agreements, sufficient or excess collateralization, or even unpublished agreed orders, Zurich insists that this matter is not unique in its facts, but rather it is unique only to the extent that the debtor (now represented by LCC) has decided to challenge the ability of the insurance company to receive reimbursement of its deductible loss projections by way of administrative expense priority.[20]   On the other hand, LCC asserts that this type of case is extremely rare because the insurance companies typically take large strides to protect their interests when negotiating coverage of a financially unstable company, whether by means of securing greater cash outlay during the bankruptcy coverage period or by adequately collateralizing the risk inherent with deductible policies.[21]

_____

[20] Aside from the explanations of Zurich, it is clear to the Court that this controversy has only reached this stage because of the failed collateral, which Zurich incidentally required to offset some of the risk attendant to deductible policies, especially those entered into with companies in bankruptcy, despite an alleged custom in bankruptcy that priority status is routinely awarded for insurers in Zurich's shoes.

[21] Neither party suggests that guaranteed cost policies (i.e., non-deductible policies) are the norm or even utilized to any meaningful degree by debtors in bankruptcy.  The reluctance toward guaranteed cost policies stems from the prohibitive costs associated with the policies because insureds are effectively paying for the prospective deductible obligations up-front, which places all of the risk on the shoulders of the insurer because the deductible obligations may far exceed

Despite the void of controlling authority, the decision reached in *In re Eli Witt* involves a very similar factual scenario and, as a result, the parties have discussed the case at length and the decision was relied upon heavily by the Bankruptcy Court below. *See In re The Eli Witt Co.*, 213 B.R. 396 (Bankr. M.D. Fla. 1997).  As Zurich now requests in the current matter, the insurance company in *Eli Witt* asserted "an administrative expense for claims it calculate[d] it [would] have to pay in the future due to accidents or occurrences which occurred postpetition, but which it [would] not have actually paid by confirmation."  *Id.* at 398.  In response, the debtor in *Eli Witt*, mirroring the spirit of LCC's objections here, argued that the future liability was "grossly exaggerated and highly speculative" and that it would be "improper to allow any part of the estimate, potential future claims because of the radically changed circumstances."[22]  *Id.* at 399.

The ultimate holding in *Eli Witt* denied the administrative expense claim primarily because the court lacked the ability to estimate the speculative expenses:

> [T]he majority of the Insurance Company's administrative expense claim represents its estimation of claims it will be required to pay in the future, but will not actually have paid by confirmation.  The Insurance

---

actuarial estimations (Zurich claims that there was such an underestimation of ultimate loss projections in this case, for which Zurich is still paying the price).  In fact, during oral argument, Zurich estimated that the premium costs of a guaranteed cost policy for the Debtors during bankruptcy would have been well over five times that of the deductible policy ($10 million for the entire period vs. at least $50 million for only one year).

[22] The bankruptcy proceedings in *Eli Witt* actually involved a plan of reorganization under Chapter 11, rather than a complete liquidation as eventually suffered by the Debtors here.  In addition, there is a procedural difference between the two cases in that the bar date for the filing of administrative expense claims in *Eli Witt* was set pre-confirmation, while the bar date in the present matter was three months post-confirmation.  In hindsight, it would appear that the approach in the *Eli Witt* bankruptcy was more advantageous because it permitted the Court to assess all administrative expense claims, and consequently the true feasibility of the plans, prior to confirming the bankruptcy plan.  However, this difference in timing does not factor into the relevance of the *Eli Witt* decision vis-a-vis the case *sub judice*.

Company estimates these future claims against the Debtor based on its own statistical analysis of the likelihood such claims will occur.  Section 502(c) provides that contingent or unliquidated claims shall be estimated for the purpose of allowance if the liquidation would unduly delay the administration of the case.  There is nothing in this record which would enable this Court to estimate these future claims, therefore, this portion of the Insurance Company's claim cannot be allowed in any amount and should be disallowed without prejudice.

*Id.* at 400.  Zurich attempts to distinguish *Eli Witt* on numerous grounds – including lack of assumption and inducement – concluding that the case is "inapplicable to the present case."[23]  It is unclear why either the Debtors' assumption of the Zurich policies or the inducement of Zurich is of legal consequence.  The assumption only signifies that the debtor-in-possession effectively purchased coverage and the Debtors decision to approach Zurich for coverage during bankruptcy, rather than Zurich soliciting the Debtors, certainly had no affect on Zurich's ability to refuse to provide coverage.[24]

Overall, while there is a lack of precedential guidance in this matter, notwithstanding the decision in *Eli Witt*, there is certainly not a lack of arguably analogous case law in support of both positions.  These persuasive authorities generally fall into two categories.  The large majority involve controversies with the temporal demarcation between pre- and

---

[23] Zurich also points to the apparent reluctance by the court in *Eli Witt* to grant the administrative expense claim based only on the lack of actuarial evidence in the record sufficient to permit sound estimation.  Although the "estimation" issue is addressed *infra*, it is notable that the court in *Eli Witt* did not find estimation as an appropriate exercise in the administrative expense context even though it could be argued that failure to estimate in that case could have caused "undue delay" because the claim bar date was set prior to the plan confirmation.  Here, however, the bar date for the filing of an administrative expense claim was established after the plan confirmation; thus, the estimation debate would not implicate any delay in the bankruptcy administration.

[24] In fact, Zurich points out numerous times that other insurance companies made the decision not to insure the Debtors when approached because the deal was apparently too risky a proposition.  This only bolsters the logical conclusion in this case that Zurich took a calculated risk in its decision to insure the Debtors during bankruptcy and now that risk is failing to pay off.

post-petition that Zurich cites in support of its contention that the deductibles, although prospective, should relate back to the insurance coverage period during bankruptcy. The less prevalent group of authorities deal with scenarios post-confirmation. Although the subject-matter is a departure from the present context, LCC cites these cases in support of the general proposition that any expenses arising post-confirmation, regardless of whether they are connected to a petition-period expense, cannot by definition receive administrative priority because they do not provide a direct benefit fostering the preservation of the estate.

The collective theme from the long string of cases cited by Zurich is that, in determining what temporal designation (i.e., pre- or post-petition) should be given to expenses that are paid during bankruptcy, if the expenses arise from events or conduct that occurred pre-petition then the claimed expense are not considered administrative expenses because the underlying event or conduct did not itself provide a direct and substantial benefit to the estate.[25]  *See, e.g.*, *In re Highland Group*, 136 B.R. 475 (Bankr. N.D. Ohio 1992); *In re Baldwin-United Corp.*, 48 B.R. 901 (Bankr. S.D. Ohio 1985); *see also* Appellant's Opening Brief (Doc. # 12, p. 33-35). To that effect, Zurich argues that "the rationale of these cases is directly applicable to the issue in the present case – i.e.,

---

[25] It is this type of scenario where the value of the benefit to the estate test is realized. Under the traditional requirements of § 503, it would be difficult to assess whether expenses arising during bankruptcy but stemming from conduct pre-petition should receive administrative priority because, technically speaking, the payment of the expenses is necessary to preserve the estate from a legal perspective. However, that is not the true spirit of § 503. Therefore, the benefit to the estate test was developed to ask whether the payment of the claimed expenses would provide a direct and substantial benefit to the estate. In the current matter, the usefulness of the benefit to the estate test is questionable as discussed. Payment of clams as they arise post-confirmation could be argued to provide a benefit because the claims resulted from pre-confirmation conduct. But, pursuant to § 503, the payment of Zurich's claimed expenses would not act to preserve the estate because, as stated ad nauseam, there is no estate to preserve.

determining whether a claim arose pre- or post-effective date."   Zurich concludes accordingly that because "the occurrences underlying Zurich's Claim all took place prior to the effective date, the Claim arose pre-effective date" and should receive priority treatment.

While the logic behind the line of cases dealing with pre- and post-petition scenarios makes sense in the abstract as applied to Zurich's claim since the circumstances here provide a similar time barrier (pre- and post-confirmation), such an approach does not address the purpose of granting administrative priority and is therefore of little assistance. Even if the mandate of Zurich's persuasive authority placed the "accrual" of the claimed expenses back to the bankruptcy period, despite the reality that the expenses are entirely prospective and speculative, such a finding does not alter the dispositive adjudication that the payment of the claimed expenses when they truly arise would not act to either preserve nor benefit the estate.   Accordingly, administrative priority above that of an ordinary unsecured creditor is not warranted in this instance.

The second category of cases, which favor LCC's proposition that administrative expense priority is not appropriate in this matter, deal with expenses that arise or are otherwise paid post-confirmation.   In this unique context, courts, although few in number, have consistently held that expenses arising post-confirmation fail to satisfy the requirements for administrative priority under § 503 for the simple, yet inescapable reality that there is no estate to preserve or benefit.

The Sixth Circuit, in an unpublished decision, succinctly rejected the counter-intuitive proposition that expenses incurred after the dissolution of an estate can be administrative:

       The logic of this conclusion becomes apparent upon an examination of the Bankruptcy Code's purpose for giving special priority to administrative expenses.  Administrative expenses are given priority because they are the actual, necessary costs of preserving the estate.  Because there is no need to preserve an estate that has been terminated, costs that are incurred after that time are not administrative expenses of the estate.

See Guy, 1992 U.S. App. LEXIS 10018, at *12 (citing United States v. Redmond, 36 Bankr. 932, 934 (D. Kan. 1984).  In Guy, the court was charged with determining whether taxes incurred and paid after confirmation were entitled to administrative priority.  Relying on the Supreme Court's holding in Otte v. United States, 419 U.S. 43 (1974), the Sixth Circuit held that the claimed expenses in Guy were not administrative expenses despite the fact that the wages on which the taxes were paid were earned during the bankruptcy:

       The disputed taxes in this case were on wages that were paid after the bankruptcy estate was terminated.  The taxes were therefore not incurred by the estate and are not administrative expenses of the estate.  The fact that the wages were earned during the pendency of the estate is simply irrelevant. . . .  Because they were incurred by the trustee after the plan was confirmed and the estate ceased to exist, they were not incurred as the actual costs of preserving the estate and therefore cannot be construed as administrative expenses of the estate.

Id. at *12-13.

       When adjudicating claims for administrative priority, bankruptcy courts have consistently emphasized that priority status should be reserved for only those expenses that are critical to the administration of the bankruptcy estate.  See In re Barker Medical Co., Inc., 55 B.R. 435, 436 (Bankr. M.D. Ala. 1985) ("Administration of the estate ended with confirmation of the plan.  The costs were not incurred by the estate, but were incurred by the debtor after discharge and after confirmation at a time when no estate existed. . . . By definition, the costs cannot be administrative expenses.").  Bankruptcy courts have similarly emphasized that a bankruptcy estate is a statutory creation that terminates at the

-34-

effective date (i.e., confirmation) and, consequently, an estate cannot incur administrative expenses after its termination:

> It is clear that only those obligations of a debtor's estate which arise post-petition and fall within the parameters of § 503(b) are entitled to treatment as administrative expenses. Section 503 is silent as to the point in time at which the expenses of a debtor in reorganization cease to be accorded first priority administrative expense status. However, the language of § 503(b) suggests that for "actual, necessary costs and expenses" to be afforded administrative expense status, they must be incurred for "preserving the estate."
>
> The filing of a Bankruptcy petition creates an estate. . . .  In a case under Chapter 11, the estate continues until confirmation of the Plan . . . at which time all of the property of the estate vests in the debtor.  After that time, the estate is no longer in existence.  Thus, costs and expenses incurred in a Chapter 11 case post-confirmation cannot be said to have been incurred for "preserving the estate" such that they are administrative expenses under § 503(b)(1)(A).

*In re Frank Meador Buick, Inc.*, 59 B.R. 787, 791 (Bankr. W.D. Va. 1986) (internal citations omitted).

The district court in *Frank Meador Buick*, reviewing *de novo* the decision of the bankruptcy court below, concurred in the bankruptcy court's holding that priority status was not appropriate nor warranted.  *See Dobbins v. Frank Meador Buick, Inc. (In re Frank Meador Buick)*, 65 B.R. 200 (W.D. Va. 1986).  On appeal, the district court concluded that claims arising not only post-petition but also post-confirmation are not administrative expenses under the Code:

> When however, the debtor incurs costs not merely post petition but also post-confirmation they are not, and cannot, be classified as administrative expenses.  After confirmation of a plan under Chapter 11, administration of the estate ends and the estate ceases to exist.  Thus, it is impossible to classify taxes or rents that accrue post-confirmation as administrative expenses for the simple reason that after confirmation there is no longer an estate to administer.
>
> Relying on the fact that [Debtor] incurred both the taxes and rent post-petition, [Appellant] contends that both claims are entitled to share a priority

-35-

> position.  [Appellant] ignores that his own claim for rent, and the IRS claim for taxes, arose not merely post-petition but post-confirmation as well.  As a result, neither claim may receive priority status as an administrative expense; both are ordinary creditor claims.

*Id.* at 203 (internal citations omitted).

The rationale and holdings of the aforementioned cases, which definitively reject the characterization of post-confirmation expenses as administrative, has been mirrored in the large majority of the remaining cases addressing the pre- and post-confirmation scenario. *See, e.g., In re Pauling Auto Supply, Inc.*, 158 B.R. 789, 794 (Bankr. N.D. Iowa 1993) ("Inasmuch as there is no estate, a post-confirmation creditor is unable to obtain administrative status for a post-confirmation claim because there is no estate to preserve."); *In re James Fredrick Severson*, 53 B.R. 8, 10 (Bankr. D. Or. 1985) ("For losses or expenses incurred after [confirmation], there could be no claim allowable under § 503(b)(1)(A) as an expense of preserving the estate since no estate existed after that date.").  Accordingly, it is clear that the case law applicable to the circumstances *sub judice*, although not directly on point on either side of the debate, strongly favors the conclusion of this Court that expenses incurred post-confirmation are not entitled to priority treatment as administrative in nature.

## C.     Other (Non-Dispositive) Considerations

### 1.     Estimation of Expenses

Because the Code does not explicitly authorize estimation of expenses in the administrative claim context, the parties have addressed the question of whether the Code even permits estimation (i.e., § 503 requires expenses to be "actual") and what form of estimation would prove sufficient if permitted.[26]  The Bankruptcy Court below was "not convinced that estimation is even proper in this instance."   As the court explained, estimation of claims is only an approved method of winding up under § 502(c) for "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."   11 U.S.C. § 502(c).

The large majority of courts addressing estimation have consistently held that, because § 502 covers pre-petition claims of general creditors, the allowance for estimation of claims under § 502(c) is reserved only for claims falling within the scope of § 502.  *See In re Indian Motocycle Co.*, 261 B.R. 800, 810 (1st Cir. BAP 2001) ("[W]e have not found a single case which has estimated a debtor's postpetition administrative tax claim pursuant to § 502(c).").   Administrative expense claims, however, fall under the § 503 priority scheme for administration of the bankruptcy estate, which immediately calls into the question the availability of § 502(c) estimation for administrative claims.  Presumably,

---

[26] LCC argues that advancing Zurich the prospective deductible obligations not only exceeds the scope of the Bankruptcy Court's authority under § 503, but allowing administrative priority would circumvent the contractual expectations of the parties and is tantamount to breach of contract because the legal obligation to reimburse Zurich for deductible advancements does not accrue until Zurich is forced to pay the potential claims as they actually arise in the future.

estimation of post-petition claims was not cognized by § 502(c) because such claims are the exclusive domain of § 503.

Although very few courts have addressed the issue of estimating administrative expense claims under the authorization of § 502(c), the bankruptcy court of the Eastern District of Virginia explicitly rejected the idea that § 502(c) could act to authorize estimation for administrative claims that inherently fall under § 503:

> There are differences between requests for payment [of an administrative expense] and proofs of claim. One relates to allowance. A proof of claim is deemed allowed unless a party in interest objects to the claim. A properly filed proof of claim constitutes prima facie evidence of the validity and amount of claim. A contingent or unliquidated claim may be estimated under § 502(c) if the fixing or liquidation of the claim would unduly delay the administration of the estate. None of these provisions apply to a request for payment [of an administrative expense claim]. The burden of proof for the request is on the claimant. There is no comparable provision for estimating contingent or unliquidated administrative expenses. In fact, administrative expenses are required to be "actual, necessary costs and expenses of preserving the estate."

*In re Atcall, Inc.*, 284 B.R. 791 (Bankr. E.D. Va. 2002) (internal citations omitted).

Furthermore, the First Circuit's Bankruptcy Appellate Panel, addressing the analogous problem of estimating administrative tax liability claims, held that estimation was not proper through the use of § 502(c) where not otherwise authorized:

> We find that the bankruptcy court erred by applying § 502(c) to estimate the post-petition tax liability of the Debtors. . . . We are convinced that the proper statutory construction requires that administrative tax liability be determined according to the provisions of § 505. . . . To the extent there is an argument that the general language of § 502(c) may be stretched to cover even postpetition claims, we follow the established rule of statutory construction that a more specific statute covering a particular subject is controlling over a statutory subject in more general terms.

*In re Indian Motocycle Co.*, 261 B.R. at 809-10 (internal citations omitted). Accordingly, in light of the purpose and scope underlying the allowance for administrative expense priority

-38-

under the Code and the requirement that expenses be "actual" pursuant to § 503, the use of § 502(c) estimation for § 503 administrative expenses is counter-intuitive and the authority to do so seems lacking under the circumstances.[27]

### 2.      Policy Concerns

Zurich has vowed that disallowing its claim for administrative expense priority will effectively turn the bankruptcy and insurance worlds "upside down."  The  concern, however genuine, is that insurance companies will no longer insure debtors during bankruptcy if the prospective deductibles are not characterized as administrative expenses because that will place an excessive amount of risk on the shoulders of the insurance company – risk that the utilization of a deductible policy is intended to offset.  Zurich maintains that guaranteed cost policies, those without deductible obligations, would be far too expensive for the financially-strapped companies to afford.  And if debtors are therefore unable to secure insurance coverage during bankruptcy, this would in turn prevent the continuing operation of most debtors-in-possession.  Consequently, the end result is the supposed devaluation of the estate to the detriment of all creditors thereof.

The  value  that  insurance  coverage  provides  to  debtors-in-possession  during bankruptcy cannot be overstated.  *See Reading*, 391 U.S. at 483 ("It is of course obvious that proper insurance premiums must be given priority, else insurance could not be obtained; and if a receiver or debtor in possession is to be encouraged to obtain insurance in adequate amounts, the claims against which insurance is obtained should be potentially

---

[27] Perhaps estimation only would, or even should, be necessary where the administrative claim bar date is set prior to the confirmation date (*see, e.g.*, *Eli Witt*) in order to estimate the claims that may arise between the bar date and confirmation date, which was not the case here.

payable in full.")  Nevertheless, the precedential repercussions felt by denying Zurich's claim under these narrow circumstances will not produce the dire picture that Zurich now paints.

The parties acknowledge that the current controversy stems largely from the failure of the Frontier collateral utilized as security for the projected deductible losses.  In business terms, therefore, the pertinent question is who should bear the risk realized – the Debtors (now represented by LCC) because the prospective deductibles will be legal obligations as they arise, or should Zurich absorb the loss because it failed to adequately assess the risk and protect its interests?  The answer is reached by the simple realization that the question before the Court is not whether Zurich should be reimbursed for the deductibles where incurred in the future (as a creditor of the now-defunct estate), but instead whether Zurich's claim for prospective expenses should receive administrative priority treatment. Proverbially speaking, Zurich made its bed and the other parties in interest – including LCC and the public by way of reclamation – should not be forced to sleep in it.

Zurich argues that it simply assumed that receiving administrative expense priority treatment for the loss projections was a foregone conclusion and that it relied upon this presumed reality when negotiating with the debtors-in-possession.  However, this raises the rather conspicuous question of why Zurich would require extensive collateral from the debtor-in-possession if receiving administrative expense priority was never a problem in past cases.  The June 25, 2004 Amended Order explicitly stated that Zurich retained the right to file an administrative claim for loss projections not covered by the collateral and that the Debtors (now represented by LCC) retained the right to object to any such claim:

> The projected total liability by the Debtors that will be due and owing to Zurich over the lifetime of the payments under the Insurance Contracts is in excess of $10,000,000, and Zurich retains the rights to assert an administrative claim for the balance of any claims under the Insurance Contracts.  The Debtors reserve the right to object to any additional administrative claim asserted by Zurich.

While this evinces knowledge by both parties and the Bankruptcy Court that an administrative claim by Zurich was possible and perhaps even likely, it also demonstrates that Zurich had no guarantee of receiving administrative priority for the prospective deductible obligations.  A sense of entitlement may have existed as to any premium and deductible obligations arising pre-confirmation or pre-effective date, but despite Zurich's plea otherwise, there is nothing in the record that demonstrates justifiable reliance on the part of Zurich as to the prospective and speculative obligations post-confirmation.

Furthermore, Zurich's efforts to obtain adequate collateral to protect its interests, despite the alleged belief that it would receive priority payment of the loss projections regardless, ironically demonstrates not only that Zurich did not justifiably rely on receiving priority status, but also that the consequences of denying Zurich's administrative expense claim in this instance will not have a material effect on either the process or the prospects of insurance coverage during bankruptcy.  In other words, seeing as Zurich attempted to secure sufficient collateral to cover its risk and that this case arose due to the rare instance of the collateral proving insufficient, there is nothing to suggest that future parties will not continue to negotiate collateralization of deductible risks.  Perhaps even greater collateralization will become necessary to insure against the result Zurich now faces, but that can be viewed as a positive development and in no way necessitates the prohibitive use of guaranteed cost policies when insuring debtors-in-possession.

Finally, despite the fact that Zurich places great weight on the allegation that the Debtors induced Zurich to provide ongoing coverage during bankruptcy, the practical reality remains that Zurich is an incredibly sophisticated, for-profit insurance corporation that was fully aware of the risks associated with insuring a financially-troubled business.  The parties concede that this controversy would not be at issue but for the unfortunate failure of a substantial portion of the collateralizing bonds to pay off.[28]  As such, because the coverage agreements in this case were reached at arm's length and contentiously negotiated by parties of unquestionable competence, any alleged inducement is of no legal significance and the Court will not disturb the contracts here simply because one party may have more adamantly approached the other to do business.

### 3.      Participation in Plan Feasibility

LCC asserts that Zurich's failure to object to the confirmation of the Debtor's Plan proves "fatal" to its administrative claim despite Zurich's timely submission of its claim within the established bar date for priority claims.  The Bankruptcy Court below focused on Zurich's failure to "participate" but it is unclear whether the determination was necessary to the court's ultimate decision to deny Zurich's claim or merely an additional area of consideration that may justify the adverse ruling against Zurich.  The Bankruptcy Opinion notes that because Zurich was not sufficiently involved in the process, if at all, it deprived

---

[28] Adding to the overall speculative nature of Zurich's claim is the uncertainty that still surrounds the allegedly defunct Frontier bonds that provided for partial collateralization of the deductible obligations under the Zurich policies.  In essence, Zurich is requesting accelerated payment for prospective deductible expenses without affirmative (i.e., "actual") knowledge that the problem bonds will not adequately cover the obligations or what those obligations will prove to be.

the parties in interest from accounting for Zurich's massive administrative claim in assessing the ultimate feasibility of the Debtors' Plans:

> As Lexington Coal points out, Zurich chose not to participate in the plan process until after the Plans had been confirmed. The creditors and other parties in interest in this case were thus necessarily deprived of the opportunity to factor in a huge administrative expense claim that would have had a major effect on the consideration of the feasibility of the Debtors' proposed Plans. Lexington Coal asserts that Zurich should have participated in the Debtors' cases and requested an estimation of its administrative expense claim prior to the confirmation process. It further asserts that Zurich's request for estimation is neither appropriate nor timely under these circumstances. This court agrees.

*In re HNRC Dissolution Co.,* 343 B.R. at 845.

Whether or not Zurich should have participated in the feasibility process, a question which is almost rhetorical in hindsight, it is clear that Zurich was not required to do so.  The Bankruptcy Court established a bar date for administrative claims that ran three months past confirmation;  Zurich's claim was timely in that regard.  Both parties and the court had notice that an administrative claim by Zurich was at the very least a possibility due to the mention of such in the June 25, 2004 Amended Order that reserved a right to Zurich to file the claim and the attending right of the Debtors to object.

Although it would now appear that Zurich's failure to participate in the bankruptcy was done so potentially to its detriment, there is no guarantee that its participation would have altered the feasibility of the Debtors' Plans because the collateralization of the claimed expenses was believed to be adequate at that juncture.[29]  Regardless, while Zurich's absence from the bankruptcy may ultimately prove fatal to its prospects of recovering the

---

[29] Zurich noted that at the time it filed its administrative expense claim, which was several months beyond the feasibility stages, that the decision to file was merely a protective measure taken to ensure that the deductible obligations would be paid if the collateral proved insufficient.

prospective deductible obligations practically speaking, Zurich's absence does not prove fatal to its claim for administrative expenses from a legal standpoint.

### IV.   CONCLUSION

In accordance with the foregoing analysis, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that the Bankruptcy Court's denial of Zurich's application for allowance of an administrative expense claim on prospective deductible obligations under the Zurich Policies be, and hereby is, **AFFIRMED.**

It is further **ORDERED** that this matter is **stricken** from the active docket of the Court.  This is a **final** and **appealable** order.

This 2nd day of July, 2007.

Signed By:

_David L. Bunning_   *DB*

United States District Judge

G:\DATA\Opinions\0-06-104 - Zurich (MOO).wpd

-44-